**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**FELIX GARCIA,**

      **Plaintiff,**

**vs.**                                                 **Case No. 4:07cv474-SPM/WCS**

**WALTER McNEIL, TOMMY YOUNG,**
**MARTIE TAYLOR, and LONG N. DO,[1]**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

Plaintiff, a *pro se* inmate, filed an amended civil rights complaint, doc. 6, alleging

an equal protection violation, an Americans with Disabilities Act claim, and a

Rehabilitation Act claim.  Plaintiff has a profound hearing loss and seeks

accommodation by prison staff so that he may listen to television by purchasing an

audio device through a private vender instead of through the prison canteen.  Doc. 6,

pp. 5-6.  At the conclusion of discovery, Defendants in this action (Secretary Walter A.

_____

[1] Defendant Do's name has been incorrectly listed in the style of this case, and is corrected here.  The Clerk shall note the change on the docket.

McNeil,[2] Statewide ADA Coordinator Martie Taylor, Assistant Warden Tommy Young, and Chief Health Officer N. Long) filed a motion for summary judgment.  Doc. 34. Plaintiff filed opposition to the summary judgment motion on October 3, 2008, doc. 36, and recently filed a supplement to his response.  Doc. 39.

## I.     Legal standards governing a motion for summary judgment

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  Id.  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

---

[2] The complaint was initially against James McDonough, but pursuant to a court order entered on April 24, 2008, Walter A. McNeil was automatically substituted as a Defendant in his official capacity pursuant to Fed. R. Civ. P. 25(d).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998), quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  The Local Rule provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Facts set forth in Defendants' statement will be deemed admitted (if supported by the record evidence) unless controverted by Plaintiff's statement.

## II.    The relevant Rule 56(e) evidence

Plaintiff is an inmate incarcerated at Polk Correctional Institution, serving a life sentence, and he has been incarcerated since 1983 when he was twenty-two years old. Doc. 34, p. 1; Ex. A (doc. 34-2, p. 10); Ex. B (doc. 34-3, pp. 2, 5).[3]  Plaintiff suffers profound hearing loss stemming from chronic mastoiditis, an infection in the mastoid bone.  Doc. 34, p. 2; Defendants' Ex. E (doc. 34-6, p. 2).  Plaintiff has suffered from that condition since he was a child.  *Id.*  Because Plaintiff is completely deaf in his left ear, Defendants suggest that a hearing aid is not warranted.  Doc. 34, p. 2.  Plaintiff has been "fitted with a hearing aid for his right ear."  Defendants' Ex. E (doc. 34-6, p. 2).  Plaintiff is "able to hear with the assistance of the hearing aid, but his hearing is very limited."  *Id.*[4]

Plaintiff obtained his GED while in prison, on February 22, 1989.  Defendants' Ex. C (doc. 34-4, p. 1).  Plaintiff also earned a certificate in Business Administrative Operation on July 16, 1992.  Doc. 34, pp. 2-3; Defendants' Ex. C (doc. 34-4).  Plaintiff understands American Sign Language.  Doc. 34, p. 2; Defendants' Ex. E (doc. 34-6, p. 2).  On August 17, 2007, Plaintiff requested that he be permitted to communicate in writing during medical visits rather than through an interpreter.  Doc. 34, p. 3; Defendants' Ex. E (doc. 34-6, p. 2).

---

[3] References to exhibits are listed first to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

[4] In Plaintiff's opposition to summary judgment, he states he "is 'profoundly deaf' in his left ear, and that he is severely impaired of hearing in his right ear."  Doc. 36, p. 28.

As evidence, Plaintiff submitted a memorandum issued by Assistant Warden Young, dated August 30, 2007, containing a response from Defendant Taylor, the Statewide ADA Coordinator.  Plaintiff's ex. 2 (doc. 36-2).  The response is to Plaintiff's ADA accommodation request for "a certified sign language interpreter during medical visits."  *Id.*  Defendant Taylor explained that "[o]ther inmates should never be used as sign language interpreters during medical visits."  *Id.*  She advised that when Plaintiff was interviewed, he "agreed to use lip reading and note writing in his medical visits" but counseled that if Plaintiff were "undergoing a lengthy or complex medical procedure, a certified interpreter must be provided for him."  *Id.*  Defendant Taylor, thus, modified Plaintiff's request.  *Id.*

Plaintiff is incarcerated at Polk Correctional Institution.  That institution provides televisions for prisoners that broadcast the audio portion through a radio signal that inmates can then hear through personal radios which are purchased in the Institution's canteen.  Doc. 34, p. 2 (citing Plaintiff's amended complaint, doc. 6).  The televisions provide closed captioned and TDY/TDD[5] as accommodations for hearing impaired inmates.  Doc. 34, p. 2; Defendants' Ex. E (doc. 34-6, p. 2) (Ex. G)(doc. 34-8, pp. 3-4).  The Department does not receive funding from the federal government to provide televisions as those are donated by private individuals or organizations.  Doc. 34, p. 2;

---

[5] TDD, Telecommunications Device for the Deaf, is a "machine that employs graphic communication in the transmission of coded signals through a wire or radio communication system."  Doc. 34, p. 2, n.3.  A closed caption television displays the television's audio as text on the television screen.  *Id.*  TDY refers to a telecommunications device for making telephone calls.  *Id.*, at 4.  TDD and TDY "translates spoken words into written text for" a deaf telephone user, and the user "then responds by typing his message into the TDD which transforms the typed message into spoken words."  Chisolm v. McManimon, 275 F.3d 315, 319, n.1 (3d Cir. 2001).

Defendants' Ex. G (doc. 34-8, p. 4).  The Department also does not provide radios for inmates, but inmates may purchase radios in the canteen.  Doc. 34, p. 2; Defendants' Ex. G (doc. 34-8, p. 5).

Plaintiff submitted a formal request for an accommodation on June 26, 2007 and described his disability as "hearing impaired."  Defendants' Ex. G (doc. 34-5, p. 1). Plaintiff reported that he could not hear "music or radio programs as do other inmates" through the "low-amplitude radios made available in canteens."  *Id.*  He advised that the "television's audio is provided inmates by designated FM radios signal" [sic] but he could not hear it "through radios sold in canteens."  Defendants' Ex. D (doc. 34-5, p. 1). When asked what specific modification or accommodation he was requesting, he responded:

> Allow family to purchase a higher decible [sic] AM-FM (of appropriate dimensions) radio from an authorized dealer and to permit authorized dealer to mail the radio to the institution for delivery.

Defendants' Ex. D (doc. 34-5, p. 1).  Dr. Do, the Chief Health Officer at Polk C.I., reviewed the request and verified that Plaintiff has hearing loss and "has hearing aid." Defendants' Ex. D (doc. 34-5, p. 2).  Dr. Do concluded that Polk Correctional Institution provides "reasonable accommodation" because there is "close captioned TV, TDY phone," and a radio is made available in the canteen.  *Id.*  Dr. Do wrote: "I am not sure 'a higher decibel AM-FM Radio' may [sic] provide any better benefit than the radio available through canteen."  *Id.*  In his affidavit, Dr. Do explained "I did not recommend that [Plaintiff's] request be granted because of the severity of his hearing loss and there is no certainty that a higher decibel level radio would benefit him."  Defendants' Ex. E (doc. 34-6, p. 2).

Defendant Young, the Assistant Warden of Programs at Polk Correctional Institution, denied Plaintiff's request for the accommodation on July 19, 2007, relying on Dr. Do's recommendation. Doc. 34, p. 4; Defendants' Ex. D (doc. 34-5, p. 2); Defendants' Ex. F (doc. 34-7, p. 1). The basis for that decision reiterated, "The Department has provided reasonable accommodation by offering radios that are purchased through canteen." *Id.* Defendant Young also explained that Plaintiff "did not identity an outside vendor or the radio that he wished to obtain." Defendants' Ex. F (doc. 34-7, p. 2).

The form used by the Department contains a space for noting when the inmate was interviewed concerning his or her request for an accommodation, and identifying the person who conducted the interview. Defendants' Ex. D (doc. 34-5, p. 2). The form shows that Plaintiff was not interviewed by Dr. Do concerning his request. *Id.*

The form also notes that a decision concerning a request would "be rendered within 10 days of receipt at the Intake Officer's office . . ." Defendants' Ex. D (doc. 34-5, pp. 1, 3). Presumably because Plaintiff did not receive a response within that period, a second request for accommodation was made on July 12, 2007. Defendants' Ex. D (doc. 34-5, p. 3). Plaintiff complained that "the current radios being sold in the canteen are of low decibel levels and I can not hear as normal people do." *Id.* He again requested that his family be allowed to purchase a radio with the decibel levels high enough so that he could hear the radio." Defendants' Ex. D (doc. 34-5, p. 3). Dr. Do's response in reviewing the request is identical to that on the June 26th request, and again, Plaintiff was not interviewed. Defendants' Ex. D (doc. 34-5, p. 4). The assistant warden denied the request on August 3, 2007, and stated, "Your issue has been

address [sic] on DC2-530 which you filed on 6/26/07 and returned to you on 7/19/07,

therefore will not be readdressed, a copy of the DC2-530 has been forward to Ms.

Taylor, ADA Coordinator, in Central Officer, for her review."  *Id.*

Martie Taylor, the ADA Coordinator for the Department of Corrections, reviewed

Plaintiff's request for accommodation and sent a memorandum to Defendant Young, the

assistant warden, concurring with the decision to deny Plaintiff's request.  Defendants'

Ex. D (doc. 34-5, p. 5).  The memorandum specifically commented that the opinion of

"Medical" was that a higher decibel radio "would [not] be any more effective than those

sold by the canteen; therefore the inmate's request was denied."  *Id.*  Defendant Taylor

also issued a memorandum on September 11, 2007, to Curtis Greene, with the Bureau

of Inmate Grievance Appeals, advising that the Institution's response (presumably on a

grievance appeal) was correct.  Defendants' Ex. D (doc. 34-5, p. 6).  The memorandum

concluded:  "In addition, the head of the security department in the central office has

determined that allowing radios other than those provided by the canteen are a security

risk and are not to be allowed on the compound."  *Id.*

Defendant Taylor submitted an affidavit clarifying that, although she is the ADA

Coordinator for the Department, she is "not a medical doctor or a health care

professional," and is not authorized to make medical decisions regarding medical

treatment for inmates."  Defendants' Ex. G (doc. 34-8, p. 2).  Taylor relied "on medical

staff to determine whether an inmate has a verified disability and whether a specific

accommodation request might effectively address a disabled inmate's disability related

needs."  *Id.*  Taylor accepted "Medical's conclusion that a higher decibel radio would not

be any more effective for [Plaintiff] than those sold in the inmate canteen."  Defendants'

Ex. G (doc. 34-8, p. 3).  Defendant Taylor also concluded that because Polk

Correctional Institution already provided closed caption television, Plaintiff was provided

an adequate accommodation.  *Id.*

Taylor noted that previously, the Department authorized the purchase of a non-

standard radio to accommodate "disabled inmates who could not use the canteen

radios."  Defendants' Ex. G (doc. 34-8, p. 4).  After the manufacturer ceased production

of the item, "some institutional staff allowed inmates to order other radios that were not

pre-approved by the Department."  *Id.*  Defendant Taylor sought to "resolve confusion

that had developed regarding an acceptable radio."  *Id.*  Thus, Defendant Taylor

"purchased a higher decibel radio from the vendor that is approved by the Department

to provide aids to our disabled inmates (Independent Living Aids), and" provided the

radio to James Upchurch, the Department's Chief of Security, for his consideration.

Defendants' Ex. G (doc. 34-8, p. 3); Defendants' Ex. H (doc. 34-9, p. 3).  After

examining the radio, he concluded it "posed a security risk that should not be allowed

into the institutions."  Defendants' Ex. G (doc. 34-8, pp. 3-4).  The basis for Defendant

Upchurch's conclusion of a security risk was because it had an "opaque exterior that

would allow for the undetected storage of contraband . . . [and] would also impede

security cell searches as the radio would have to be taken apart in order to verify that no

contraband had been stored within it."  Defendants' Ex. H (doc. 34-9, pp. 3-4).

Independent Living Aids is the vendor authorized by the Department of

Corrections to provide auxiliary aids for disabled inmates.  Doc. 34, p. 5; Defendants'

Ex. G (doc. 34-8, pp. 3, 5).  In 2000, the Department "specifically identified certain items

sold by this vendor as authorized auxiliary aids for our disabled inmates."  Defendants'

Ex. G (doc. 34-8, p. 5).  Defendant Taylor advises that it is important for the Department to "authorize specific auxiliary aids in order to avoid the introduction of highly valuable devices into the institutions."  *Id.*  Such valuable provides, for example "a higher quality radio, will be stolen by other inmates."  *Id.*  Thus, to minimize theft, the Department seeks "to identify products that are comparable to the value of the products offered in the inmate canteen. . . ."  *Id.*

Walkenhorsts is not a vendor authorized by the Department.  Defendants' Ex. G (doc. 34-8, p. 6).  That vender does not ship packages by United States Mail, which is the method used by Independent Living Aids to ship merchandise to the institutions. Defendants' Ex. G (doc. 34-8, pp. 5-6).  Plaintiff did not request permission to order a radio from the vender "Walkenhorsts."  Doc. 34, p. 6; Ex. D (doc. 34-5, p. 1).  Plaintiff did, however, request permission to order a higher decibel radio from an "authorized dealer."  Defendants' Ex. D (doc. 34-5, p. 1).

Defendant Taylor's affidavit also advises that once the Department "learned that the radios sold in the canteen had earbuds that will not work for an inmate with a hearing aid that is in the ear, we reviewed and approved a specific set of headphones sold by the Independent Living Aids that will fit over the ears."  Defendants' Ex. G (doc. 34-8, p. 6).  Those headphones "will allow hearing impaired inmates with in-the-ear hearing aids to use headphones while also reducing the feedback between the headphones and hearing aid."  *Id.*

Mr. Upchurch also provided an affidavit in which he explains that over the last few years, the Department "began requiring that inmates purchase only clear-cased radios."  Defendants' Ex. H (doc. 34-9, p. 2).  That requirement was for security

purposes in that it limited an inmate's ability to "hide contraband within a radio" and facilitated "more efficient security searches . . . ."  *Id.*  The Department used to permit inmates to have opaque cased radios, and inmates who already had "opaque cased radios [were] allowed to retain their property until it is no longer operable."  *Id.*; Doc. 34, p. 5.

Inmates can only purchase items from the canteen, not from (unapproved) outside vendors.  Defendants' Ex. H (doc. 34-9, p. 2).  "Package permits were authorized in the past, but have been eliminated."  *Id.*  Requiring the purchase of items from the canteen "ensures the standardization of inmate property."  *Id.*  Standardization facilities efficient security searches, avoids problems between inmates, and is an important security issue.  *Id.*  Standardized radios also ensure that there is no interference with the Institution's radio system or security system as the use of "non-standard radios" could operate on frequencies which might create interference.  Defendants' Ex. H (doc. 34-9, p. 3).

The Department also used to permit inmates to receive packages delivered by private mail delivery companies, but now only allows delivery through the U.S. Postal Service.  Defendants' Ex. H (doc. 34-9, p. 3).  Private companies delivered at varied and unpredictable times, which created staffing problems and accountability issues.  *Id.*

Defendant Taylor also states in her affidavit that "[t]he Department of Corrections does not receive any Federal Funding for the provision of television to inmates."  Defendants' Ex. G (doc. 34-8, p. 4.).  Indeed, the Department does not provide televisions, but permits donations "by private citizens or organizations, and when a television set ceases working the set is not replaced by the Department of Corrections."

Defendants' Ex. G (doc. 34-8, pp. 4-5).  Defendant Taylor acknowledges that "depending on the age of the television, closed captioning may not be available on a particular set."  Defendants' Ex. G (doc. 34-8, p. 5).

Defendants have provided evidence showing that when two inmates (Horn and Deal) were authorized to purchase a radio from an outside vender, the approval was done in error.  Doc. 34, p. 5 (Ex. F).  The two inmates did not receive their radios.  Doc. 34, p. 5 (Exhibits F, I).[6]  An affidavit submitted by Sergeant Graham states that "neither inmate Deal nor inmate Horn received a radio between May 1, 2007 and today." Defendants' Ex. I (doc. 34-10, p. 2).

Plaintiff, however, has provided evidence that inmate Dennis Deal was given approval in November of 2002 to purchase a "Radio A.D.A." from C. Crane Co., Inc., from Fortuna, California, for $79.95.  Plaintiff's Ex. 6 (doc. 36-2, p. 11).  The Inmate Bank Trust Fund Special Withdraw form shows that check number 110394 was issued on December 30, 2002.  *Id.*  Plaintiff has presented an "Inmate Partial Property Return Receipt" which was dated January 13, 2002, showing an FM AM radio was returned to inmate Dennis Deal from storage.  Plaintiff's Ex. 6 (doc. 36-2, p. 12).  Furthermore, when the radio needed to be repaired in July of 2006, inmate Deal's request to send it to

---

[6] Defendants point that out Plaintiff alleged in his initial complaint that inmates Horn and Deal did not receive the radios because the vender shipped them by U.P.S. Doc. 34, p. 5, n.6, *citing* doc. 1, pp. 15-16.  Defendants fail to state why the inmates did not receive the radio, or why the initial approval was "in error."  *See, e.g.,* Defendants' Ex. F (doc. 34-7, p. 2); Defendants' Ex. I (doc. 34-10, p. 2).

the C. Crane Company was granted on the condition that it was "sent to the vendor for repair."  Plaintiff's Ex. 6 (doc. 36-2, p. 14).[7]

Plaintiff also provided evidence that inmate Dennis Deal was given approval in May of 2007 to purchase a "radio and headphone" from Walkenhorsts, from Napa, California, for $37.93.  Plaintiff's Ex. 6 (doc. 36-2, p. 13).  The Inmate Bank Trust Fund Special Withdraw form shows that check number 0297731 was issued on May 17, 2007.  *Id.*

Plaintiff has presented an "Inmate Request" dated January 14, 2002, from inmate Robert Hawk, concerning his request to purchase a "special radio & headset from Radio Shack."  Plaintiff's Ex. 7 (doc. 36-2, p. 19).  The request for the radio was granted on January 17, 2002, and inmate Hawk was directed to have his family have the manufacturer send it directly to the inmate, not to the family.  *Id.*  Plaintiff also presented the Personal Property List for inmate Hawk which shows that a Sony Walkman and Maxell Headphones were returned to him on July 3, 2006.  Plaintiff's Ex. 8 (doc. 36-2, p. 20).

Plaintiff presented evidence of a memorandum from James A. Galloway, the Supervisor for Region III TV Repair, dated May 12, 2008.  Plaintiff's Ex. 9 (doc. 36-2, p. 21).  It advises that in "October, 2006 Polk C.I. administration approved installation of F.M. transmitters in all inmate televisions."  *Id.*  The "transmitters allow T.V. programming to be heard on inmate's radio headphones and are now installed in every dormitory at the Main Unit and Work Camp Annex."  *Id.*  "When the transmitters were

---

[7] An ADA accommodation request by inmate Deal to have his radio repaired or replaced was denied on August 6, 2007, stating the "Department do [sic] not repair or replace personal radio."  Plaintiff's ex. 6 (doc. 36-2, pp. 15-17).

installed the external volume levels on the television sets were limited to reduce the amount of noise in dormitory T.V. rooms.  This was facilitated in order to help the hearing impaired inmates at the institution."  *Id.*

As additional evidence, Plaintiff submitted a memorandum from Defendant Taylor, dated November 6, 2007, which was a "partial grant" of an accommodation's request by Plaintiff.  Doc. 39, p. 12; Plaintiff's Ex. 13 (doc. 39-2, p. 6).  Plaintiff was authorized "to purchase 'over the ear' headphones" which was believed to be able to help Plaintiff "hear [using] the radios sold in the canteen."  Plaintiff's Ex. 13 (doc. 39-2, p. 6).  Plaintiff, however, submitted an inmate request, Plaintiff's Ex. 17 (doc. 39-2, p. 16), and a grievance seeking assistance from Defendant Young in trying to see if the headphones would work with the current radios being sold in the canteen.  Plaintiff's Ex. 18 (doc. 39-2, p. 17).  There is no response on either form.

**III.    Analysis**

**a.    Americans with Disabilities Act claim**

Title II of the ADA prohibits a "public entity" from discriminating against "a qualified individual with a disability" on account of the individual's disability, as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132, *quoted in* Bircoll v. Miami-Dade County, 480 F.3d 1072, 1081 (11th Cir. 2007).  A "qualified individual with a disability" is defined under Title II as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation

barriers, *or the provision of auxiliary aids and services*, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2) (emphasis added).  A disabled prisoner has "a Title II ADA claim if he is denied participation in an activity provided in state prison by reason of his disability."  Bircoll v. Miami-Dade County, 480 F.3d at 1081, *citing* Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 211, 118 S.Ct. 1952, 1955, 141 L.Ed.2d 215 (1998).  Title II of the ADA is applicable to services, program and activities within prisons, and prisoners may not be discriminated against on account of a disability.  Pa. Dep't of Corr. v. Yeskey, 524 U.S. at 211, 118 S.Ct. at 1955, 141 L.Ed.2d 215 (1998); *see also* United States v. Georgia, 546 U.S. 151, 154, 126 S.Ct. 877, 879 (2006); Raines v. State of Fla., 983 F.Supp. 1362, 1369-70 (N.D. Fla. 1997).

Furthermore, the Attorney General's implementing regulations "provides that "[a] public entity shall take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a), *quoted in* Bircoll, 480 F.3d at 1082.  Such steps include providing "appropriate auxiliary aids and services" so that a disabled individual has an equal opportunity to participate in an activity of the public entity.  480 F.3d at 1082.[8] Moreover, the regulations states that "[i]n determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities."  28 C.F.R. § 35.160(b)(2).  "The ADA defines 'auxiliary

---

[8] The Regulation provides: "A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity."  28 C.F.R. § 35.160(b)(1).

aids and services' to include 'qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments.' "  42 U.S.C. § 12102(1)(A), *quoted in* Bircoll, 480 F.3d at 1082.

To state a claim under Title II of the ADA, Plaintiff must allege that: (1) he is a qualified individual with a disability, (2) and that he was "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity" (3) by reason of his disability.  Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001), *cited in* Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1298 (11th Cir. 2005); Bircoll, 480 F.3d at 1083.  Plaintiff alleged he is disabled under the ADA, and that his substantial hearing loss affects a major life activity.  Doc. 36, pp. 9-10.  Those facts are not disputed.  The central dispute here is whether providing closed caption television is sufficient as a "reasonable accommodation" to satisfy the Department's obligation under the ADA.

Defendant contends this claim fails because Plaintiff "has not been denied access to the television at the institution in which [he] is incarcerated."  Doc. 34, p. 8.  While acknowledging that inmates can listen to television audio that is "broadcast over radio waves that inmates hear through their personal radios, it is also true that the television audio is made available to [Plaintiff] through closed captioning."  *Id.*  Closed captioning "is a reasonable accommodation that makes the television audio accessible to [Plaintiff.]"  *Id.*  Defendants' evidence also acknowledges that closed captioning is not available on all televisions.

Plaintiff argues in response that his level of literacy is not sufficient to keep up with fast-moving closed captioning.  Doc. 36, pp. 11-13.  Plaintiff asserts that his "long-

term hearing disability" has affected his comprehension and he reads slowly, with his index finger under "the word he is attempting to decipher."  Doc. 36, p. 12.  Plaintiff stress that his reading ability, at least for terms of literacy, is based on stationary reading materials, not moving narratives controlled by the pace of the speech.  *Id.*, at 12-13.  Additionally, Plaintiff argues that his decision to use written communication for medical call-outs instead of an interpreter is "not because he could write or read proficiently."  Doc. 36, p. 16.  Instead, Plaintiff states that he had not been provided a qualified interpreter but another inmate who was also hearing impaired.[9]  *Id.*, at 16.  Plaintiff also states that not all television stations provide "adequate or effective closed caption service" and that he is denied television where "absolutely no closed caption transmission is available" and that not all televisions have closed captioning.  Doc. 39, p. 11.

While Plaintiff has presented argument in defense of this claim, Plaintiff has not provided evidence[10] under Rule 56 which may appropriately be considered as opposition to the summary judgment motion.  It will be presumed, however, that Plaintiff *could* provide evidence in an affidavit attesting to his literacy if called upon to do so.  At the least, he could describe in an affidavit his difficulties with closed captioning and he is

---

[9] It is also a reasonable inference that an interest in having some privacy with respect to medical issues would also be an important factor in not having an interpreter present during a medical call-out.  This inference, which must be in Plaintiff's favor, does not demonstrate the proficiency of Plaintiff's literacy.

[10] Plaintiff did submit as documentary evidence a "test report" which he suggests shows his literacy level.  Plaintiff's Ex. 1 (doc. 36-2).  The document, however, is unexplained and not helpful.

competent to so testify since it his own personal experience that he would be describing.

It is also reasonable to infer from the evidence that there are times when Plaintiff is denied access to the television because not all programs have closed captioning. It must also be accepted at this stage of the litigation that Plaintiff's literacy level *could* impede his participation. Reading and comprehending at one's own pace is different from reading a quickly moving narrative. It is, accordingly, not clear that Plaintiff has been provided "meaningful access to the benefit" offered. Alexander v. Choate, 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985), *quoted in* Raines, 983 F.Supp. at 1373. Plaintiff has raised a genuine dispute of material fact as to whether the accommodation is reasonable in light of his apparent literacy difficulties, the lack of closed captioning with some programs, and the fact that not all televisions have closed captioning. While it is accepted that not every television must be closed captioned and accessible to Plaintiff, it is also true that *if* the accessible televisions place Plaintiff in unjustified isolation, that is also a "form of discrimination." *See* Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600-601, 119 S.Ct. 2176, 2187 (1999) (considering "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions."). It is unclear the extent of these problems, but it is enough at this stage to find a genuine dispute of a material fact which precludes summary judgment on this claim.

It is also troubling that while audio has essentially been eliminated for all inmates, absent the purchase of personal radio devices, a barrier has been erected preventing hearing impaired inmates to obtain devices which may accommodate their special

needs.  It is reasonable to infer that had televisions not been so modified, Plaintiff *might*

have been able to hear television through use of his hearing aid.  However, as Plaintiff

has explained, the hearing aid cannot be worn simultaneously with the personal radio

device that must be used to listen to the broadcast audio.  Further, if all items not

purchased in the canteen must come from an approved vender, as urged by Defendant,

then some accommodation should be available for these items.  Yet Defendants' own

evidence demonstrates that the approved vender (Independent Living Aids) does not

provide a device that would be acceptable to Defendants, considering the security

concerns of the Department.

Thus, there is sufficient evidence that Plaintiff has been excluded from the

"benefits of the services, programs, or activities" of the Department and his disability

has not reasonably been accommodated.  Plaintiff has shown a triable issue on this

question, and it is recommended that the summary judgment motion be denied.

**b.     Rehabilitation Act claim**

The Rehabilitation Act provides in pertinent part:

No otherwise qualified individual with a disability in the United States, as
defined in section 705(20) of this title, shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the benefits of,
or be subjected to discrimination under any program or activity receiving
Federal financial assistance. . .

29 U.S.C.A. § 794(a).  The elements of a *prima facie* case of discrimination under the

Rehabilitation Act are essentially the same as that under the Americans with Disabilities

Act, except for the additional requirement of showing the defendant is a recipient of

federal funds.  Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Thus, Plaintiff

must show that the program or activity from which he was excluded or denied a benefit

"received or was directly benefitted by federal financial assistance." Doyle v. Univ. of Ala., 680 F.2d 1323, 1327 (11th Cir. 1982) (quoting Brown v. Sibley, 650 F.2d 760 (5th Cir. 1981)); see also U.S. Dept. of Transp. v. Paralyzed Veterans of America, 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) (holding that § 504 of the Rehabilitation Act could not be applied to entities that did not "actually receive federal financial assistance").  A "program or activity" is defined as including "all of the operations" of a state or local government.  29 U.S.C. § 794(b)(1)(A).

Defendants contend that Plaintiff is "not qualified" under the Rehabilitation Act because he "cannot hear the television audio."  Doc. 34, p. 12.  But Defendants admit that a "qualified handicapped person" is defined as a "handicap person who meets the essential eligibility requirements for the receipt of such services." Id., p. 13, quoting 28 C.F.R. § 42.540(1).  Defendants, therefore, have confused Plaintiff's qualifications to participate in the activity with his hearing abilities to participate.  The latter relates to his impairment, not to his essential eligibility.  Although Defendants have presented no basis for determining when an inmate is afforded television privileges, it is reasonable to conclude that inmates may do so during certain hours of the day when they are not otherwise required to be working, performing assigned duties, or engage in education classes.  In other words, absent some disciplinary action that causes Plaintiff to lose television privileges, this is an activity that is provided by the Department for all inmates and for which all inmates are generally qualified.  Few other qualifications can be imagined.[11]  As a prisoner in the Department of Corrections, Plaintiff would appear to

---

[11] Defendants argue that Plaintiff has implied that the "changed circumstances" of installing the television audio system is what compelled his "need for a higher decibel radio."  Doc. 34, p. 13, n.9.  Defendants note that Plaintiff "never directly states that he

meet all of the requirements to participate in watching television, "in spite of his handicap." Onishea v. Hopper, 171 F.3d 1289, 1300 (11th Cir. 1999), *quoting* Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979).

Defendants also assert that Plaintiff cannot state a claim upon which relief may be granted because the Department "does not receive federal funding for the provision of television to inmates." *Id.*, at 12-14. Plaintiff disputes Defendants' argument, and has shown that even though the televisions were not purchased by the Department of Corrections, the Department did purchase multiple audio reducing electronic devices to effectively reduce television audio at the set's external speakers and instead broadcasts the audio via a fixed FM radio frequency through the electronic device, so that all prisoners may hear the audio on personally owned FM radios. Doc. 36, p. 21; *see also* pp. 17-19. In other words, Defendants have spent funds to make alterations to the televisions provided. Plaintiff states that the electronic devices were purchased from "monies allotted as budget to the vocational television repair and electronics shop." *Id.*, at 21. Plaintiff has also claimed that the Department used federal FEMA funds to purchase "new omni directional antennas" and mounting poles. *Id.* He also argues that 40 digital converter boxes were purchased with federal coupons and the assistance of Department of Education funding. Doc. 39, pp. 10-11. Plaintiff argues that the Department has demonstrated a willingness to provide and maintain television viewing

could hear the television audio in the dayrooms prior to the installation of the television audio system that transmits the television audio through radio waves." *Id.* That omission is irrelevant, however, since Defendants have altered the conditions for watching and hearing television.

as a recreational activity for inmates and has spent money to purchase components to repair televisions, and to modify the manner in which inmates can watch television.[12] Doc. 36, pp. 21-22.  Plaintiff has raised a genuine dispute of fact on this issue and pointed to facts which show the Department has received federal assistance in providing television viewing for inmates in its custody.

Defendants also assert that because closed captioning is available, Plaintiff cannot state a claim under the Rehabilitation Act.  *Id.*, at 11.  The argument should be rejected for the same reason it was rejected in considering the ADA claim.  The motion for summary judgment should be denied as to the Rehabilitation Act claim as well.

c.      **Equal Protection claim**

Plaintiff alleged that other inmates were able to obtain special radios but Plaintiff's request was denied.  Defendants have presented evidence that the initial permission given to those inmates was in error.  They have shown that additional safety measures have been implemented which now preclude a practice that was previously permitted.  Defendants acknowledge that "inmates who already possessed opaque cased radios are allowed to retain their property until it is no longer operable." Defendants' Ex. H (doc. 34-9, p. 2).

Plaintiff, however, has come forward with evidence to show that other inmates have received radios (with higher decibel audio) as he himself has requested.  Perhaps the actual receipt of those radios was prior to the change in policy, but that fact is not entirely clear.  Defendants have not pointed out a precise date on which the policy

---

[12] Plaintiff submitted evidence showing that the Department "ordered equipment to be placed in the dormitories to make TV transmission available on [a] normal radio channel."  Plaintiff's ex. 18; *see also* Plaintiff's ex. 9.

changed.  Nevertheless, Plaintiff has presented evidence that other inmates who have similar hearing deficiencies, were allowed to obtain a higher decibel radio from an outside vender.  Further, such radios have been permitted to be kept and used by other inmates.  Indeed, Defendants' own evidence shows that inmates whose radios were received previously, but do not meet current regulations, are able to retain their radios.  Thus Plaintiff has shown that other similarly situated inmates have that which he has been denied.[13]  Plaintiff has at least shown a genuine dispute of fact as to this claim.

Defendants' evidence is that the change in policy was because opaque-cased radios posed security concerns.  Those concerns, however, may not be alleviated when some inmates maintain such property.  A triable issue of material fact exists as to the nature and extent of these security concerns.  Under these circumstances, the motion for summary judgment should be denied as to the equal protection claim as well.

**d.    Speech Therapy**

Defendants assert that Plaintiff has suggested in this case that he needs speech therapy and a higher decibel radio will aid him in his effort to learn to speak.  Doc. 34, p. 17.  Defendants argue that this claim is unexhausted and should be dismissed.  *Id.*  No such claim is raised within the amended complaint, and this action is deemed only to challenge the denial of a personal radio obtained from an outside vender.  There are no factual allegations presented concerning the denial of speech therapy.  Plaintiff states in his response to summary judgment that there is no speech therapy program available to

---

[13] Plaintiff argues that when he initiated this case, several other inmates sought to be co-plaintiffs with him.  Doc. 36, pp. 23-24.  That fact, however, does not show that those inmates were treated differently; rather, it shows instead that those inmates were treated the same as Plaintiff when their accommodation requests were similarly denied.

him.  Doc. 36, p. 32; *see* Plaintiff's Ex. 10 (doc. 36-2, p. 23).  Thus, exhaustion "would be an exercise in futility and waste of resources."  *Id.*  Accordingly, while it is unclear whether this claim was actually made, Defendants' motion for summary judgment should be granted as to any speech therapy claim.

**e.      Individual Capacity Claims**

Defendants are correct that there is no individual capacity liability under Title II of the ADA or the Rehabilitation Act.  Garcia v. S.U.N.Y. Health Scis. Ctr. Of Brooklyn, 280 F.3d 98, 107 (2nd Cir. 2001); Albra v. Advan, Inc., 490 F.3d 826, 829-830 (11th Cir. 2007).  The summary judgment motion in favor of Defendants should be granted as to claims for individual capacity liability.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 34, be **DENIED in part and GRANTED in part.** The motion should be granted as to any claim concerning speech therapy, and claims against Defendants in their individual capacities.  Otherwise the motion should be **DENIED**, and this case remanded for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on June 22, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**