**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**FELIX GARCIA,**

     **Plaintiff,**

**vs.**                          **Case No. 4:07cv474-SPM/WCS**

**KENNETH TUCKER,
in his official capacity,**

     **Defendant.**

_____/


**<u>FIFTH REPORT AND RECOMMENDATION</u>**[1]

     This case was initiated by Plaintiff acting *pro se* on November 7, 2007.  Doc. 1.

After surviving summary judgment, counsel was appointed to represent Plaintiff.  Docs.

48-49.  Following additional discovery and several extensions of time, both Plaintiff and

Defendant filed motions for summary judgment on October 31, 2011.  Defendant's

motion, doc. 267, includes the statement of facts within the motion, and Plaintiff's

---

[1] The first report and recommendation, doc. 40, recommended denial of Defendants' motion for summary judgment, doc. 34.  The second report and recommendation, doc. 135, recommended denial in part of the motion to amend, doc. 120.  The third report and recommendation, doc. 197, recommended denial of Plaintiff's motion to consolidate, doc. 167.  The fourth report and recommendation, doc. 244, recommending denial of Plaintiff's motion to certify class, doc. 195, and the motion for a p, doc. 198.

motion, doc. 268, is supported by a separately filed statement of facts, doc. 269.

Defendant responded in opposition to Plaintiff's motion, doc. 276, and filed a separate

statement of facts, doc. 277.  Plaintiff filed a response in opposition to Defendant's

motion, doc. 278, with a separate statement of facts, doc. 279, and additional evidence.

This report and recommendation rules on both summary judgment motions, docs. 267

and 268.

**Claims of the revised second amended complaint, doc. 207**

Plaintiff suffers from profound hearing loss in both ears.  He alleges that the

Florida Department of Corrections has violated Title II of the Americans with Disabilities

Discrimination Act (hereinafter ADA) and § 504 of the Rehabilitation Act.  Doc. 207.

Plaintiff seeks a declaratory judgment, nominal damages, an award of costs and

attorneys fees, and injunctive relief that will require the Defendant to "accommodate the

needs of deaf and/or hard of hearing inmates by providing them with an opportunity to

purchase a radio and other necessary devices that would allow them to hear the radio,

and to be assured that they will be housed at an institution that transmits television

audio over radio signals, so that they may be able to enjoy the television, as the non-

deaf and/or hard of hearing inmates do."  Doc. 207, pp. 14-15, 17-18.

**Standard of review**

Either the claimant or Defendant may move for summary judgment, with or

without supporting affidavits, upon all or any part of his or her claim.  Fed. R. Civ. P.

56(a).  Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  "Once the moving party has properly supported its

motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.' " Int'l Stamp Art, Inc. v. U.S. Postal Serv., 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element ... on which that party will bear the burden of proof at trial.' " Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (modification in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

A defendant need only show "there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).  However, in opposition to summary judgment, a plaintiff must "present evidence from which a jury might return a verdict in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Put another way, Plaintiff has the burden of coming forward with evidentiary material demonstrating a genuine issue of fact for trial.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." Hickson Corp. v. Northern Crossarm Co., Inc..357 F.3d 1256, 1259 (11th Cir. 2004).  Furthermore, a factual issue "is genuine 'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.' "  Western Group Nurseries, Inc. v. Ergas, 167 F.3d
1354, 1361 (11th Cir. 1999), *citing* Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

Plaintiff, as the claimant, "is entitled to a summary judgment only when no
genuine issue of material fact exists, the papers on the motion demonstrate his right to
relief, and every one of the defenses asserted legally are insufficient."  10A C. Wright,
A. Miller, and M. Kane, Federal Practice and Procedure § 2734, at 405 (1983).  Since
Plaintiff (as the party with the burden of proof) has a heavier burden on summary
judgment, I will consider the Defendant's motion first.  If Defendant's motion is denied, I
will consider whether Plaintiff is entitled to judgment as a matter of law.

**Undisputed evidence**

Plaintiff Felix Garcia is serving a life sentence in the Florida Department of
Corrections, having entered custody on August 17, 1983, when he was 22 years old.
Docs. 267, 279.  Plaintiff's profound hearing loss stems from chronic mastoiditis, an
infection which developed when he was a child.  Doc. 276-6 (Ex. E, p. 2).  Plaintiff is
completely deaf in his left ear, and although he has a hearing aid for his right ear, he
has very limited hearing in the right ear.  *Id.*

In 1986, while incarcerated at Charlotte Correctional Institution Plaintiff received
a device from his family called a "pocket talker" which enabled him to hear television
and radio.  Doc. 198-3, Ex. C; doc. 267, p. 10; doc. 267-12 (Ex. K).  When Plaintiff was
transferred to Polk Correctional Institution, the device was taken away by prison officials
at that institution.  Doc. 279-2 (Garcia Declaration); Doc. 198-3 (Ex. C).  Polk
Correctional Institution had closed captioned television, but not all stations or all
programming have closed-captioning, and, because of his literacy level, Plaintiff has a

difficult time reading the closed captioning when available, and sometimes the words come across garbled.  Doc. 198-3 (Ex. C).  Polk C.I. modified the televisions in or about October, 2006,[2] and began broadcasting the television audio through a radio signal that inmates hear through their personal radios.  Doc. 36-4.  Inmates may purchase radios from the prison canteen to listen to television, but those radios are not sufficient for Plaintiff's hearing limitations.  Doc. 198-3, p. 2.

On June 26, 2007, Plaintiff submitted a "reasonable modification or accommodation request" in which he described his problem: "Due to impairment, and low amplitude radios made available in canteens, I can not hear music or radio programs as do other inmates."  Doc. 267-5 (Ex. D-1).  Plaintiff said that the television audio "is provided [to] inmates by designated FM radios signal that I can not hear through radios sold in canteens."  *Id.*  Plaintiff requested permission to allow his family to purchase a higher decibel AM-FM radio from an authorized dealer and allow the dealer to mail the radio to the institution so he could also listen to music and television.[3] *Id.*  That request was denied, based at least in part on the opinion of Dr. Do that he was "not sure" a higher decibel radio would benefit Plaintiff (despite not having interviewed

---

[2] A Department of Corrections memorandum states that in "October, 2006[,] Polk C.I. administration approved installation of F.M. transmitters in all inmate televisions. These transmitters allow T.V. programming to be heard on inmate's radio headphones and are now installed in every dormitory . . . ."  Doc. 36-4.  The memo was dated May 12, 2008, but the alteration had to have taken place by June of 2007.  *Id.; see* doc. 267-5 (Defendant's Ex. D1).

[3] The affidavit of James Upchurch, Bureau Chief for Security Operations for the Department of Corrections, explains that inmates "are not authorized to purchase items from outside venders."  Doc. 267-9 (Ex. H).  "Package permits were authorized in the past, but have been eliminated."  *Id.*  Furthermore, inmates may only receive mail delivered by the United States Postal Service and not through private mail services.  *Id.*

Plaintiff concerning the issue) and Dr. Do stated that reasonable accommodation was provided at Polk C.I. because of the close caption television and radios that were available in the canteen.  Doc. 267-5 (Ex. D-2); doc. 276-6 (Ex. E, p. 2).

Plaintiff submitted another "reasonable modification or accommodation request" describing his problem this time more clearly: "The current radios being sold in the canteen are of low decibel levels and I can not hear as normal people do."  Doc. 267-5 (Ex. D-3).  Plaintiff again requested permission to allow his family to purchase a radio with the decibel levels high enough so that he could "hear the radio as other inmates do."  *Id.*  That request was denied in early August, 2007, based on the identical reasons, but Plaintiff's request was forwarded to "Ms. Taylor, ADA Coordinator, in Central Office, for her review."  Doc. 267-5 (Ex. D-4).  On August 23, 2007, Martie Taylor issued a memorandum, through the Assistant Warden, stating: "Medical was consulted and it was their opinion that a higher decibel radio would [not] be any more effective than those sold by the canteen; therefore the inmate's request was denied."  Doc. 267-5 (Ex. D-5); doc. 267-13 (Ex. L3).  Ms. Taylor concurred in the decision to deny Plaintiff's request.  *Id.*

Plaintiff submitted a grievance seeking to "be allowed to purchase a radio with a higher decibel level."  Doc. 267-13 (Ex. L1).  The grievance was denied.  Doc. 267-13 (Ex. L2).  Plaintiff submitted a grievance appeal, which was also denied.  Doc. 267-14 (Ex. M1-M2).  Another memorandum from Ms. Taylor to Curtis Greene in the Bureau of Inmate Grievance Appeals advised that the denial of Plaintiff's grievance was correct and, additionally, "the head of the security department in the central office has

determined that allowing radios other than those provided by the canteen are a security risk and are not to be allowed on the compound."  Doc. 267-5 (Ex. D-6).

Plaintiff grieved the denial of his request.  At the appeal level, Plaintiff was informed that the radio was not approved by security because it had an opaque case and not a clear case.  Defendants have presented evidence that James Upchurch denied the request because he was not shown a clear case radio, and Martie Taylor was unaware that a clear case radio was available.  Doc. 267-9 (Ex. H, p. 2); Doc. 267-18 (Ex. Q, p. 54); *see also* Doc. 267-16 (Ex. O, p. 38).

During the course of this litigation, Martie Taylor authorized Plaintiff to purchase equipment which Plaintiff's attorney had provided to the Department for inspection. Docs. 267, 279.  A letter dated August 17, 2010, was delivered to Plaintiff authorizing him to purchase the equipment provided: a clear case radio, hook, and amplifier.  Doc. 167 (Ex. C); doc. 267-4 (Ex. C1-C2).  Plaintiff was advised that he could "order the equipment using the Inmate Trust Fund Special Withdrawal, form DC2-304, and the funds [would] be withdrawn from [his] inmate bank account."  Doc. 267-4 (Ex. C2). Plaintiff was directed to contact the Assistant Warden for Programs should he have any questions.  *Id.*  A notation on the form indicates it was "hand delivered" to Plaintiff, who refused to sign for receipt.  *Id.*  Plaintiff, however, asserts in his Declaration that "Ms. Taylor's letter does not indicate where the equipment can be purchased . . . ."  Doc. 198-3 (Ex. C, p. 4).  Plaintiff states that "[i]t is unavailable for purchase through the canteen, and no instructions have been provided for alternative means to purchase the equipment."  *Id.*

On October 6, 2010, just after that authorization was given, Plaintiff was transferred away from Polk Correctional Institution, where he had been since December 15, 1992; the mission at that Institution had changed.  Doc. 267-10 (Ex. I). Plaintiff is currently housed at Tomoka Correctional Institution and his dormitory has a close captioned television, but not a modified television as existed at Polk C.I. before Plaintiff was transferred.  Doc. 267-11 (Ex. J).

The Department of Corrections is in the process of "implementing a decision to install FM radio transmitters onto televisions at all of the hearing impaired institutions within the Department."  Doc. 267-3 (Ex. B1).  A purchase request[4] has been issued to purchase "40 radio transmitters to be installed on televisions."  *Id.*  "There are presently 19 institutions within the Department which house hearing impaired inmates."  Doc. 267-3 (Ex. B2).   At each institution, "at least two televisions will be fitted with a radio transmitter."  *Id.*  The transmitters will be installed so they are accessible to the hearing impaired inmates at those institutions.  *Id.*

**Defendant's motion for summary judgment, doc. 267**

Defendant raises five bases for summary judgment: (1) mootness, (2) exhaustion, (3) no liability under the Rehabilitation Act, (4) Eleventh Amendment Immunity as to the ADA claim, and (5) no proof of intentional discrimination to support Plaintiff's claims.  Doc. 267.  Acknowledging that Plaintiff seeks two requests for relief (to be able to purchase a high decibel radio with related equipment and to be at an

---

[4] A copy of the purchase request was filed.  Doc. 267-3 (Ex. B3).  The request is dated October 7, 2011, and the status is listed as "Pending" although the form shows it was approved by "OMC Manager Kenneth Frederick" on October 18, 2011.  *Id.*

institution where radio transmitters are installed on a television accessible to Plaintiff),[5] Defendant contends both requests are now moot, but also argues that administrative remedies as to the second request have not been exhausted.

### Mootness

Defendant presents several grounds for mootness: (1) that "Plaintiff maintained at the outset of the case the transmitter was actually an obstacle, because the television audio was turned down with the transmitter's installation," and that transfer to a prison without a radio transmitter on the television has mooted his claim for injunctive relief, (2) that Plaintiff has been authorized to receive radio equipment as he originally requested, and (3) that "Defendant has placed an order for the purchase of forty radio transmitters for televisions to that a minimum of two may be installed at each Institution which is designated for the hearing impaired."  Doc. 267, pp. 15, 2.

Mootness is a lack of subject matter jurisdiction.  Troiano v. Supervisor of Elections in Palm Beach County, 382 F.3d 1276, 1278, n.2 (11th Cir. 2004), *cited in* Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 (11th Cir. 2007). Generally speaking, "When a prisoner files suit against prison officials who work in the institution in which he is incarcerated, seeking declaratory and injunctive relief on the basis of alleged wrongful conduct by those officials, and then that prisoner is subsequently transferred to another prison or released from the prison system, courts

---

[5] In the fourth report and recommendation, doc. 244, I concluded that Plaintiff's claim was to "be transferred to a prison that has television that has been altered to transmit the audio portion of the program . . . and that he be allowed to buy and have devices that allow him to receive that radio signal and hear it in his right ear, and that he be allowed to use this device or another device like it that allows him to hear ordinary radio."  Doc. 244, p. 4.

are presented with a question of possible mootness." Jordan v. Sosa, 654 F.3d 1012, 1027 (10th Cir. 2011).  "Where the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, courts have concluded that they are unable to provide the prisoner with effective relief."  Jordan, 654 F.3d at 1027, *citing to* McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1362 (11th Cir.1984) (stating the "general rule" that a "prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief" but does not moot a claim for damages).

"However, where a prisoner brings a lawsuit challenging policies that apply in a generally uniform fashion throughout a prison system, courts have been disinclined to conclude that the prisoner's declaratory or injunctive claims are moot, even after he has been transferred to another prison in that system." Jordan, 654 F.3d at 1028, *citing* Abdulhaseeb v. Calbone, 600 F.3d 1301, 1311 (10th Cir.), *cert. denied*, 131 S.Ct. 469 (2010); *see also* Randolph v. Rodgers, 170 F.3d 850, 857 (8th Cir. 1999) (concluding that transferred prisoner's ADA and Rehabilitation Act claims were not moot where the claims were asserted directly against the Missouri Department of Corrections "which controls both prisons and the funding necessary to provide the sign language interpreter requested by the plaintiff).

Here, Plaintiff has not brought a claim just challenging a prison official's discretionary act at a particular institution, and, as Plaintiff now clarifies through counsel, his claim is not for a particular form of technology.  His claim is for an accommodation that is reasonable, given technological and security concerns.  Plaintiff's disability has not changed.

It is not fair to say that when Plaintiff was at Polk C.I., the only thing impeding his ability to hear television was that the audio on the television set was turned down low because the audio was broadcast as a radio signal.  I have dealt with the false premise of this highly unpersuasive argument before.  See Doc. 244, p. 2, n. 3; doc. 239.  Prior to 1992, Plaintiff was at Charlotte C.I., had a "pocket talker," and could hear ordinary audio on the television when he was positioned next to the set.  *Id.*; doc. 239, p. 2.  In 1992, he was transferred to Polk C.I. and his "pocket talker" was taken away from him.  *Id.*  Thus, from 1992 to 2006, Plaintiff could not hear television at Polk C.I. because he did not have any assistive device.  *Id.*, doc. 239, p. 3.  In 2006, Polk C.I. "disabled the volume" on television sets and began transmitting the audio over radio.  *Id.*  Plaintiff could still not hear the television at Polk C.I., but the modification gave rise to a new way for accommodation, which Plaintiff sought.  The transfer to a prison without a radio transmitter on the television set did not moot Plaintiff's claim for an accommodation.

With respect to the second mootness argument, that he was permitted to buy the radio he sought, Plaintiff first requested an accommodation on June 26, 2007 (doc. 267-5, Ex. D, p. 1).  I appointed counsel for Plaintiff on September 15, 2009, thinking that this case could be simply resolved without the kind of litigation that has since ensued.  After all, the *only* thing needed then was a special device to receive the radio signals from the television set.  But the offer at issue was not presented to Plaintiff until nearly a year later, on August 20, 2010, (doc. 267-4, Ex. C, pp. 1-2), which was just six weeks prior to Plaintiff's transfer on October 6, 2010, (doc. 267-10, Ex. I, p. 1), making the offer

useless because the new institution did not have a television set that would transmit audio by radio. This was an empty offer, and did not moot Plaintiff's claim.[6]

The last ground for mootness, that television sets are being retrofitted with radio signal equipment, requires closer analysis. "Under Article III of the Constitution, federal courts may only hear live 'cases' and 'controversies.' " Bankshot Billiards, Inc. v. City of Ocala, 634 F.3d 1340, 1351 (11th Cir. 2011), citing U.S. Const. Art. III, § 2. "[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1183 (11th Cir. 2007), quoting Troiano v. Supervisor of Elections, 382 F.3d 1276, 1281-82 (11th Cir. 2004); see also Bankshot Billiards, Inc., 634 F.3d at 1351 (stating that if events occur after the filing of a lawsuit which would deprive the court of the ability to give the plaintiff any "meaningful relief, then the case is moot and must be dismissed."). However, "[t]he doctrine of voluntary cessation provides an important exception to the general rule." Troiano, 382 F.3d at 1282, quoted in National Ass'n of Boards of Pharmacy v. Brd. of Regents, 633 F.3d 1297, 1309 (11th Cir. 2011).

---

[6] Had he been left at Polk C.I., where the radio device would have enabled him to receive the radio signals from the television, it is conceivable that the claim would have been mooted. But there is a material dispute of fact as to whether Plaintiff was able to purchase that particular radio without further impediment. There has been no showing that Plaintiff was informed *where* he could purchase the item, or *how* it could be received by Plaintiff. As noted above, Department rules strictly prohibit inmates from purchasing items from "outside venders." Doc. 267-9 (Ex. H). Moreover, because inmates "may only receive mail delivered by the United States Postal Service and not through private mail services," it is not clear *how* Plaintiff would receive the item. Additionally, the letter provided to Plaintiff stated he was authorized to purchase the radio and "funds will be withdrawn from" Plaintiff's inmate bank account. *See* doc. 267-5 (Ex. C2). Yet, Plaintiff's request was for his family to purchase the item and have it sent to the institution.

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 288-289, 102 S.Ct. 1070, 1074 (1982).  Courts should not dismiss a case on mootness grounds without careful review of the circumstance to ensure that a defendant has not "changed course simply to deprive the court of jurisdiction."  National Ass'n of Boards of Pharmacy, 633 F.3d at 1310, citing Harrell v. The Fla. Bar, 608 F.3d 1241, 1267 (11th Cir. 2010) (holding that voluntary cessation did not render a claim moot where the government "acted in secrecy, meeting behind closed doors and, notably, failing to disclose any basis for its decision," so that the "the circumstances here raise a substantial possibility that the defendant has changed course simply to deprive the court of jurisdiction" (internal quotation and citation omitted)).  Put another way, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 719, 127 S.Ct. 2738, 2751 (2007), quoting Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); internal quotation marks omitted).

The party raising "mootness" as a defense "bears the 'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to

start up again.' " Friends of Earth, 528 U.S. at 189, 120 S.Ct. at 708 (internal citations and alteration omitted), *quoted in* Bankshot Billiards, Inc., 634 F.3d at 1351-1352.  In cases where "the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur."  Troiano, 382 F.3d at 1283 (emphasis in original).  Coral Springs Street Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328-29 (11th Cir. 2004) (noting the test for mootness is stringent, but commenting that "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.");  *see also* Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir.1988) ( "[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").  In most instances, the Supreme Court has found that voluntary cessation by governmental defendants moots the claim.  Beta Upsilon Chi Upsilon Chapter v. Machen, 586 F.3d 908, 917 (11th Cir. 2009) (collecting cases), quoted in Bankshot Billiards, Inc., 634 F.3d at 1351-1352;  National Ass'n of Boards of Pharmacy, 633 F.3d at 1310.  Yet the presumption is rebuttable, not absolute.  "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952), *quoted in* United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, n.5, 97 L.Ed. 1303 (1953).

In City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the Supreme Court denied a mootness defense even though the challenged

law was no longer in effect.  The Court noted that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.' "  Aladdin's Castle, Inc., 455 U.S. at 289, 102 S.Ct. at 1075, *quoting* United States v. W. T. Grant Co., 345 U.S. 629, 632 [73 S.Ct. 894, 897, 97 L.Ed. 1303] (1953); United States v. Trans-Missouri Freight Assn., 166 U.S. 290 [17 S.Ct. 540, 41 L.Ed. 1007] (1897).  After noting prior conduct by the City in which it returned to its former position "in obvious response" to the district court's vacated judgment, the Court was unable to find with "certainty" that a similar course would not ensue.  *Id.,* at 289, 102 S.Ct. 1070.  Because the City might reenact the ordinance, the Court concluded that federal jurisdiction was not defeated.  *Id.*; *see also* City of Sunrise, 371 F.3d at 1330 (finding the voluntary cessation doctrine inapplicable if "there is some reason to believe that the law may be reenacted after dismissal of the suit.").  Similarly, in Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla., 508 U.S. 656, 662, 113 S.Ct. 2297, 2301 (1993), the Court concluded the case was not moot when the city repealed on ordinance but replaced it with a new ordinance that differed only in "insignificant respect."

In National Ass'n of Boards of Pharmacy, the Eleventh Circuit listed three factors which should be considered in conducting a mootness inquiry:  (1) "consider whether the termination of the offending conduct was 'unambiguous;' " (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct."  633 F.3d at

1310.  These three factors are the most recent pronouncement from the Eleventh
Circuit, but four years earlier, the Court announced in <u>Sheely v. MRI Radiology Network,
P.A.</u>, 505 F.3d 1173 (11th Cir. 2007) three other factors to be considered in determining
mootness and assuring that the alleged unlawful behavior will not recur:  "(1) whether
the challenged conduct was isolated or unintentional, as opposed to a continuing and
deliberate practice; (2) whether the defendant's cessation of the offending conduct was
motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in
ceasing the conduct, the defendant has acknowledged liability."  505 F.3d at 1184.
There is similarity in these tests, so they may be combined as analyzed below:

### Motivation or Manipulation:[7]

This factor considers the timeliness of a change in conduct and whether that
change reflects deliberation into the propriety of conduct such that it reveals more than
a desire to simply avoid liability or litigation.  The purchase request for the radio
transmitters for television sets was made on October 7, 2011 (doc. 267-3, Ex. B), just
24 days prior to filing of the summary judgment motion.  The request was then still
"pending" and implementation apparently has not yet occurred.  The timing of these
events does not suggest that Defendant's new policy has been "motivated by a genuine
change of heart" but rather, timed to coincide with summary judgment.  No evidence
has been presented as to why either of these changes in conduct and policy were
made, but both have come at a late date considering this case has been ongoing since

---

[7] This factor combines <u>Sheely</u>'s second factor (whether the defendant's cessation
of the offending conduct was motivated by a genuine change of heart or timed to
anticipate suit) with <u>Pharmacy</u>'s second factor (whether the change in government
policy or conduct appears to be the result of substantial deliberation, or is simply an
attempt to manipulate jurisdiction).

November of 2007.  There is no evidence of Defendant's deliberation as to the propriety of the prior conduct such that the change reveals more than a desire to simply avoid liability or litigation.  Nor is there an offer of settlement that would include these changes as one of the terms, though it is acknowledged that liability has not been established either.  Nonetheless, the timeliness[8] consideration reflects a manipulation[9] to avoid summary judgment rather than Defendant's thoughtful change which *could* have occurred at any point in this four-year long litigation.  There is no evidence to suggest Defendant has had a change of heart.

**Consistency**

The third <u>Pharmacy</u> factor considers whether there is evidence that the government had "'consistently applied' a new policy or adhered to a new course of conduct."  Here, there is no such evidence as Plaintiff's first offer for relief was not consistent.  Just after making that offer, Plaintiff was transferred such that he would not have been provided any relief.  The most recent "new" course of conduct of the Defendant has not even been fully and permanently implemented.  Therefore, a decision to supply transmitters at some unspecified point in the future, and which decision has not yet received final approval does not support finding this case is moot.

_____

[8] Cessation of challenged conduct "that occurs 'late in the game' will make a court 'more skeptical of voluntary changes that have been made.' " <u>Harrell v. The Florida Bar</u>, 608 F.3d 1241, 1266 (11th Cir. 2010) (citing to <u>Burns v. PA Dep't of Corr.</u>, 544 F.3d 279, 284 (3d Cir. 2008) (stating "we are more skeptical of voluntary changes that have been made long after litigation has commenced.").

[9] "Our interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here." <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 288, 120 S.Ct. 1382, 1390-1391 (2000).

**Isolated or continuing practice**

It must also be considered "whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice."  Sheely, 505 F.3d at 1184.  Defendant's conduct at issue in this case has continued for the full four years of this litigation.  Defendant had been provided with several requests from Plaintiff which enabled Defendant to demonstrate whether this was a continuing practice due to policy, or whether Plaintiff suffered an isolated event.  The facts of this case leave no doubt that the events surrounding Plaintiff's inability to have an accommodation which would enable him to hear television and radio were not isolated.

**Unambiguous**[10]

It cannot be said that Defendant's "termination of the offending conduct was 'unambiguous' " nor does this record disclose that "in ceasing the conduct, the defendant has acknowledged liability."  In Harrell v. The Florida Bar, the Court noted that a "rebuttable presumption" in favor of governmental actors is applied when "a challenge to a government policy [ ] has been unambiguously terminated" and there is a "reasonable basis to believe that the policy will [not] be reinstated if the suit is terminated."  608 F.3d at 1266.  Moreover, as noted by the Eleventh Circuit in Sheely, "a defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains."  505 F.3d at 1187.

---

[10] This factor combines Pharmacy's first consideration (whether "termination of the offending conduct was 'unambiguous' ") and Sheeley's third factor ("whether, in ceasing the conduct, the defendant has acknowledged liability).

Plaintiff was denied relief for over three years, and after being provided "relief" in the form of the desired radio device, the relief was rendered meaningless in just six weeks.  The suggestion of a new policy to be implemented in the future, at an unspecified date, if final approval is provided, fails to provides this Court with an unambiguous basis to conclude the offending conduct will not recur and, moreover, will provide meaningful and lasting relief to Plaintiff.

Furthermore, after arguing mootness and exhaustion in the summary judgment motion, Defendant argues Plaintiff cannot establish Defendant's liability under the Rehabilitation Act because "[t]he evidence in this action does not amount to action taken solely by reason of the Plaintiff's disability, and this particular claim should fail on that basis."  Doc. 267, pp. 18-19.  Defendant then argues there can be no finding that "the actions of the Department constituted intentional discrimination."  *Id.*, at 22.  I recognize that a person sued must be afforded some latitude in selection of defenses, and that a vigorous defense of liability should not necessarily be equated with a refusal to grant the relief sought on a permanent basis.  But as was the case in Sheely, Defendant's continued insistence that no violations of the ADA or Rehabilitation Act occurred provide little assurance that if the case were dismissed, it might "well calculate that its new policy is no longer the preferable course of action and revert to the old policy it prefers and apparently believes to be legal."  505 F.3d at 1189.  In considering all of these factors, I conclude that Defendant has not met its heavy and formidable burden of showing it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Friends of Earth, 528 U.S. at 189, 120 S.Ct. 693.  Summary judgment motion on this ground should be denied.

**Discrimination under the Rehabilitation Act**

Defendant argues that Plaintiff cannot support his Rehabilitation Act claim

because "the evidence in this action does not amount to action taken solely by reason

of the Plaintiff's disability."  Doc. 267, pp. 18-19.  Defendant contends that Plaintiff's

disability was not "the sole motivating factor in the decisions that were made."  *Id.*, at

19.  In response, Plaintiff asserts that if the reasons for denying Plaintiff's requested

accommodation "were based on something other than disability discrimination, the

Defendant would have made some real effort – any legitimate effort – to investigate

other means by which [Plaintiff's] disability could have been accommodated, as they are

required to do under the law."  Doc. 278, p. 18.

Section 504 of the Rehabilitation Act applies to prisoners.  Harris v. Thigpen, 941

F.2d 1495, 1522 (11th Cir. 1991); Pennsylvania Dep't of Corrections v. Yeskey, 524

U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).  "To prevail on a § 504 claim,[11] a

plaintiff must show '(1) the plaintiff is an individual with a disability under the

Rehabilitation Act; (2) the plaintiff is otherwise qualified for participation in the program;

(3) the plaintiff is being excluded from participation in, being denied the benefits of, or

being subjected to discrimination under the program solely by reason of his or her

disability; and (4) the relevant program or activity is receiving federal financial

assistance.' "  H. v. Montgomery County Bd. of Educ., 784 F.Supp.2d 1247, 1261 (M.D.

Ala. 2011), *quoting* L.M.P. v. Sch. Bd. of Broward Cnty., 516 F.Supp.2d 1294, 1301

---

[11] Section 504 of the Rehabilitation Act, provides: "No otherwise qualified
handicapped individual in the United States . . . shall, solely by reason of his handicap,
be excluded from the participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal financial assistance . . . ."
29 U.S.C. § 794(a).

(S.D. Fla. 2007) (citations omitted).  Only the third factor is at issue on this motion for summary judgment (exclusion based solely on Plaintiff's disability).

"A plaintiff may prove discrimination in two ways, disparate treatment and a failure to make a reasonable accommodation."  Nadler v. Harvey, 2007 WL 2404705, *4 (11th Cir. 2007) (unpublished), *cited in* Pardo v. Napolitano, 2009 WL 3448181, *2 (S.D. Fla., 2009).  "Disparate treatment involves discriminatory intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his disability."  Nadler, 2007 WL 2404705, *4, *cited in* Pardo, 2009 WL 3448181, *2.

> By contrast, a failure to make reasonable accommodation claim 'requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.' "

Pardo, 2009 WL 3448181, at *2, *quoting* 42 U.S.C. § 12111(b)(5)(A); Nadler, 2007 WL 2404705 at *4; *see also* Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 967 (10th Cir. 2002) (noting that "prohibited discrimination includes failure to make 'reasonable accommodations' "), *citing* Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996); Riggs v. Boeing Co., 98 F.Supp.2d 1252, 1256 (D. Kan. 2000) (stating that "[d]iscrimination includes failure to make reasonable accommodation for the known physical limitations of an otherwise qualified individual with a disability unless the accommodation would impose an undue hardship upon the employer.") (citing 42 U.S.C. § 12112(b)(5)(A); McCleary v. National Cold Storage, Inc., 67

F.Supp.2d 1288, 1297 (D. Kan. 1999)).  The Rehabilitation Act clam here is an alleged

failure to make reasonable accommodation.

When "establishing discrimination by failure to make reasonable accommodation,

a plaintiff must merely show that "(1) he was disabled, (2) he was otherwise qualified,

and (3) a reasonable accommodation was not provided."  Lucas v. W.W. Grainger, Inc.,

257 F.3d 1249, 1255 (11th Cir. 2001), *cited in* Nadler, 2007 WL 2404705, at *5.  "If

establishing discrimination[12] by failure to make reasonable accommodation, a plaintiff

who satisfies the first two prongs meets the last prong merely by showing that a

reasonable accommodation was not provided."  Nadler at *5, *citing* Lucas v. W.W.

Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001), *cited in* Pardo, 2009 WL 3448181,

2.

In Southeastern Community College v. Davis, the Supreme Court considered §

504 of the Rehabilitation Act in the educational setting and held that "Section 504

imposes no requirement upon an educational institution to lower or to effect substantial

modifications of standards to accommodate a handicapped person."  Southeastern

Community College v. Davis, 442 U.S. 397, 413, 99 S.Ct. 2361, 2370-2371 (1979).  In

that case, respondent was hearing impaired and sought to be trained as a registered

nurse.[13]  The Court concluded that the College's "unwillingness to make major

adjustments in its nursing program [did] not constitute" discrimination as it was

---

[12] "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ."  Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000), *citing* 29 U.S.C. § 794(d).

[13] Respondent was already licensed as a practical nurse.  Southeastern Community College, 442 U.S. at 402, n.1, 99 S.Ct. at 2365.

undisputed that "respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered" and thus, respondent was not "otherwise qualified."  *Id.*  However, the Court also noted that "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons" will not always be clear.  *Id.*, at 412, 99 S.Ct. at 2370.  It is possible that "situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory."  Southeastern Community College, 442 U.S. at 412-413, 99 S.Ct. at 2370.

In a later case, the Court explained that Southeastern Community College "struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones."  Alexander v. Choate, 469 U.S. 287, 300, 105 S.Ct. 712, 720 (1985) (finding no discrimination under § 504 with respect to a limit on inpatient hospital care that was "neutral on its face").  The question here is whether Defendant's refusal to grant Plaintiff's accommodation request was reasonable or constituted "discrimination against the handicapped."

Although in *dicta*, and relying upon both Southeastern and Alexander, the Supreme Court has provided guidance as to what is "reasonable" in School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 107 S.Ct. 1123 (1987), by explaining what is *not* reasonable:

> Accommodation is not reasonable if it either imposes "undue financial and administrative burdens" on a grantee, *Southeastern Community College v. Davis*, 442 U.S., at 412, 99 S.Ct., at 2370, or requires "a fundamental alteration in the nature of [the] program," *id.,* at 410.  See 45 CFR § 84.12(c) (1985) (listing factors to consider in determining whether accommodation would cause undue hardship); 45 CFR pt. 84, Appendix A, p. 315 (1985) ("[W]here reasonable accommodation does not overcome the effects of a person's handicap, or where reasonable accommodation causes undue hardship to the employer, failure to hire or promote the handicapped person will not be considered discrimination"); *Davis, supra,* at 410-413, 99 S.Ct., at 2369-2370; *Alexander v. Choate*, 469 U.S., at 299-301, and n. 19, 105 S.Ct., at 720, and n. 19; *Strathie v. Department of Transportation*, 716 F.2d, at 231.

Arline, 480 U.S. at 288, 107 S.Ct. at 1131 (holding "that a person suffering from the contagious disease of tuberculosis can be a handicapped person within the meaning of § 504 of the Rehabilitation Act of 1973.").

Defendant here contends that no discrimination took place because other accommodations had already been put in place and Defendant asserts those accommodations "were sufficient."  Doc. 267, pp. 18-19.  This argument is not persuasive.  Defendant denied Plaintiff's first request for accommodation by informing Plaintiff that close captioning existed and he could purchase radios in the canteen.  Defendants' ex. D.  Plaintiff's subsequent request advised that radios from the canteen were not sufficient because the decibel level was still too low.  *Id.*  Furthermore, Plaintiff has maintained throughout this case that close captioning was not sufficient due to Plaintiff's inability to read, the unavailability of close captioning for all programming, and that captioning is often garbled.  The accommodations asserted by Defendant were not sufficient for Plaintiff and a jury could consider them unreasonable under these circumstances.

Defendant also argues it was doubted that "Plaintiff's proposed accommodation would be of any use given his severe hearing impairment." *Id.* Doubting the usefulness of a requested accommodation does not provide a basis to deny such when it causes no financial burden and does not fundamentally alter the nature of the program. "We have observed that 'mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary. . . .' " Wong v. Regents of the University of California, 192 F.3d 807, 818 (9th Cir. 1999), *quoted in* Duvall v. County of Kitsap, 260 F.3d 1124, 1136-1137 (9th Cir. 2001). It could be considered unreasonable to deny Plaintiff's request on a doubt or a hunch, at least absent some effort to actually *determine* whether the request would provide the desired benefit. Indeed, the failure to give serious consideration to an accommodation request by eliminating or confirming doubts *could* be considered by a jury as evidence of discrimination.

Finally, Defendant argues that its security concern that "the radio which was inspected was not in a clear casing" is a valid basis for denying Plaintiff's requested accommodation. *Id.* Plaintiff's first two requests for accommodation were denied without mentioning this as a basis to support the decision. When Ms. Taylor affirmed the denial of Plaintiff's request the first time, this reason was not provided. In Ms. Taylor's second letter affirming the denial, she included as a reason the fact that security had "determined that allowing radios other than those provided by the canteen" were a security risk and not permitted. In none of those responses denying Plaintiff's

request did any prison official advise Plaintiff that a radio was inspected and it was not in a clear case.  That rationale has only been provided subsequent to the initiation of this case.

When Martie Taylor first submitted an affidavit in the first summary judgment motion for this case, she did not state that the radio was denied as a security risk because of its casing; rather, the security concern was over the introduction of a "non-standard" radio of higher quality and, therefore, more valuable and more likely to cause issues with other prisoners and with correctional staff.  Doc. 34-8 (Ex. G).  It was not until Mr. Upchurch provided his affidavit (in May of 2008) with the summary judgment motion, that the opaque casing was suggested as being problematic.  Doc. 34-8 (Ex. H).  Considering the fact that this is no longer a problem because the Department has identified and approved a radio that meets security criteria, and because it appears to have been submitted as a belated justification and Plaintiff was never advised of that reason when denying his requests, a jury could find it was not reasonable to deny the request on this basis.  In summary, Defendant has not shown an entitlement to summary judgment on the basis that Plaintiff has failed to show discrimination to support the Rehabilitation Act claim because Plaintiff has come forward with evidence to show that the denial of his requested accommodation was unreasonable.

**Eleventh Amendment immunity for nominal monetary damages**

Defendant asserts Eleventh Amendment immunity for monetary damages as to the ADA[14] claim and points out that even though Plaintiff only seeks nominal damages,

---

[14]  "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

it is still applicable.  Doc. 267, pp. 19-20.  Although only one dollar is at stake, Defendant is entitled to Eleventh Amendment immunity.

Defendant correctly notes that the Eleventh Amendment prohibits suit against the State in federal court without the state's consent to suit, absent valid abrogation by Congress.  Doc. 267, pp. 19-21.  Defendant asserts that Florida has not consented, that it does not waive its immunity to suits for money damages, and that Congress did not validly abrogate its immunity under Title II of the ADA because no constitutional violation occurred.  *Id.*, at 20-21.  Defendant argues there is no need for "an intricate analysis" of this issue because Plaintiff has "no constitutional right to listen to radio or watch television."  *Id.*, at 21.

Plaintiff contends that "Defendant's analysis of whether Title II of the ADA validly abrogates state sovereign immunity is incomplete."  Doc. 278, p. 19.  Plaintiff points out that in United States v. Georgia, the Court considered the very issue raised here: "whether a disabled inmate in a state prison may sue the State for money damages under Title II of the Americans with Disabilities Act of 1990 . . . ."  United States v. Georgia, 546 U.S. 151, 152-153, 126 S.Ct. 877, 878 (2006).  The Court noted that when enacting the ADA, Congress invoked its enforcement authority under § 5 of the

---

discrimination by any such entity.' " United States v. Georgia, 546 U.S. 151, 153-154, 126 S.Ct. 877, 878-879 (2006), *quoting* § 12132 (2000 ed.).  A " 'qualified individual with a disability' " is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  § 12131(2).  The Act defines " 'public entity' " to include "any State or local government" and "any department, agency, ... or other instrumentality of a State," § 12131(1).  Georgia, 546 U.S. at 153-154, 126 S.Ct. at 878-879.  A public entity includes state prisons.  Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

Fourteenth Amendment.  <u>Georgia</u>, 546 U.S. at 154, 126 S.Ct. at 879, *quoting* 42 U.S.C.

§ 12101(b)(4).  The ADA specifically "provides that '[a] State shall not be immune under

the eleventh amendment to the Constitution of the United States from an action in [a]

Federal or State court of competent jurisdiction for a violation of this chapter.' "  546

U.S. at 154, 126 S.Ct. at 879, *quoting* 42 U.S.C. §12202.  That provision had previously

been accepted "as an unequivocal expression of Congress's intent to abrogate state

sovereign immunity."  546 U.S. at 154, 126 S.Ct. at 879, *quoting* <u>Board of Trustees of

Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 363–364, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

The Court then more narrowly held that "insofar as Title II creates a private cause of

action for damages against the States for conduct that actually violates the Fourteenth

Amendment, Title II validly abrogates state sovereign immunity."  <u>Georgia</u>, 546 U.S. at

159, 126 S.Ct. at 882.

In <u>Georgia</u>, the petitioner (Tony Goodman) was a paraplegic inmate in the

Georgia prison system who filed a complaint alleging an Eighth Amendment claim under

42 U.S.C. § 1983, Title II of the ADA, and other provisions.  Inmate Goodman's factual

allegations were:

> . . .that he was confined for 23–to–24 hours per day in a 12–by–3–foot cell in
> which he could not turn his wheelchair around. He alleged that the lack of
> accessible facilities rendered him unable to use the toilet and shower without
> assistance, which was often denied. On multiple occasions, he asserted, he had
> injured himself in attempting to transfer from his wheelchair to the shower or toilet
> on his own, and, on several other occasions, he had been forced to sit in his own
> feces and urine while prison officials refused to assist him in cleaning up the
> waste. He also claimed that he had been denied physical therapy and medical
> treatment, and denied access to virtually all prison programs and services on
> account of his disability.

Georgia, 546 U.S. 151, 154-155, 126 S.Ct. 877, 879.  The Eleventh Circuit had held that

the district court improperly dismissed Goodman's case, that he "had alleged actual

violations of the Eighth Amendment" and he should have been given leave to amend

the complaint to develop the Eighth Amendment claims.  *Id.*, at 156, 126 S.Ct. at 880.

The Supreme Court did not discuss the merits of the constitutional claims, but assumed

without deciding "that the Eleventh Circuit's treatment of these claims was correct."  *Id.,*

at 156-157, 126 S.Ct. at 880.  The Court further accepted the uncontested assertion

that the "same conducted that violated the Eighth Amendment also violated Title II of

the ADA."  *Id.*, at 157, 126 S.Ct. at 880-881.  To determine whether Eleventh

Amendment immunity was validly abrogated in a particular case, the Court in Georgia

instructed lower courts to consider three questions: "(1) which aspects of the State's

alleged conduct violated Title II; (2) to what extent such misconduct also violated the

Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not

violate the Fourteenth Amendment, whether Congress's purported abrogation of

sovereign immunity as to that class of conduct is nevertheless valid."  *Id.  See also*

National Ass'n of Boards of Pharmacy v. Board of Regents of the University System of

Georgia, 633 F.3d 1297, 1304 (11th Cir. 2011) (citing to Georgia and concluding that

"Congressional abrogation of the States' sovereign immunity is valid when the statutorily

proscribed conduct simultaneously violates a constitutional guarantee protected by the

Fourteenth Amendment.").

      The question here is whether Plaintiff has alleged conduct that independently

violates the Eighth Amendment as applied to the States through the Fourteenth

Amendment.  Defendant argues that Plaintiff has "no constitutional right to listen to radio

or watch television."  Doc. 267, p. 21.  Plaintiff states he does not claim such a right, but presents "exactly" the same claim as was brought in Georgia, "that the Defendant's deliberate refusal to accommodate his disability-related needs in a prison program violated his Eighth Amendment rights, and thus violated the provisions of § 1 of the Fourteenth Amendment."  Doc. 278, p. 20.

Plaintiff argues that he "need only claim" that Defendant's "refusal to accommodate his disability-related needs in a prison program violated his Eighth Amendment rights . . . ."  Doc. 278, p. 20.  At the summary judgment stage, however, Plaintiff must do more than "claim."  Plaintiff must *demonstrate* an actual Eighth Amendment violation.  Plaintiff must show that a prison official was deliberately indifferent to a "serious medical need" or to a "substantial risk of serious harm."  Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994).  "The Supreme Court has emphasized that '[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.' "  Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citation and quotation marks omitted), *quoted in* Chase v. Baskerville, 508 F.Supp.2d 492, 502-503 (E.D.Va., 2007) (noting that "Title II is not a congruent and proportionate means for enforcing the Eighth Amendment").  *See* Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), *cited in* Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999) (holding the denial "of outdoor exercise, although harsh, did not violate the Eighth Amendment.").

Plaintiff cites to <u>Beasley v. Harris</u> and <u>Norfleet v. Walker</u> for the proposition that when prison officials are deliberately indifferent to a prisoner's disability-related needs and refuse to accommodate "a disability," sovereign immunity is abrogated.[15]  Doc. 278, p. 20-21.  The cases do not stand for such a broad rule.

> The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

<u>Slomcenski v. Citibank, N.A.</u>, 432 F.3d 1271, 1280 (11th Cir. 2005).  A "disability" as so defined may give rise to a medical need, or it may not.  Certainly a "disability" as so defined does not necessarily prove a *serious* medical need.

Thus, in <u>Beasley</u> the inmate's leg had been amputated and he used a prosthetic leg which required special leg socks for his stump and special shoes.  <u>Beasley v. Hairrs</u>, 2011 WL 766980, *1 (S.D. Ill., 2011).  The court held that the deprivation of the special shoes, lack of sufficient socks, and the resulting problems were sufficient allegations of deliberate indifference to serious medical needs, an Eighth Amendment claim, to withstand the motion to dismiss.  *Id.*, at *4-5.  In particular, there was evidence that the plaintiff there developed painful sores on his stump and foot due to having to walk on the prosthesis without his shoes or an ability to change the leg sock, and the foot of the prosthetic leg broke for lack of a proper shoe.  *Id.*  Painful sores, standing alone, gave

---

[15] It is unresolved whether the ADA has abrogated state Eleventh Amendment immunity for an ADA claim that is not also a violation of the federal constitution.  *See* <u>Miller v. King</u>, 449 F.3d 1149, 1151 (11th Cir. 2006) (remanding to sort out the three possibilities identified in <u>Georgia</u>).  The case ultimately settled without an order clarifying the matter.  Plaintiff, however, does not argue abrogation of the Eleventh Amendment by this third route left open by <u>Georgia</u>, and therefore I will not pursue it either.

rise to a serious medical needs, especially when coupled with inability to ambulate for other serious health needs, such as personal hygiene, eating, and the like.

In Norfleet, the plaintiff alleged "unlawful deprivation of an attendant to help him with necessary daily activities including moving about within the prison, carrying his food tray and shower supplies, and deprivation of access to ADA-certified recreational equipment and the opportunity to be outside his cell on a basis equivalent to non-disabled inmates," which the court found "sufficiently stated" an Eighth Amendment claim. Norfleet v. Walker, 2011 WL 245529, *1 (S.D. Ill., 2011). Again, the evidence showed that the failure to accommodate the plaintiff's disability had caused a deprivation of essential human needs. 2011 WL 245529, *1, relying upon Georgia, 546 U.S. 151, 158, 126 S.Ct. 877, 163 L.Ed.2d 650.

Access to television in prison is not an essential human need protected by the Eighth Amendment or any other part of the federal constitution. Montana v. Commissioners Court, 659 F.2d 19, 22 (5th Cir. Sep 15, 1981)[16] (claim relating to television use was frivolous), cert. denied, 455 U.S. 1026 (1982); Rahman X v. Morgan, 300 F.3d 970, 974 (8th Cir. 2002) ("ballpoint pens and television are not necessary for a civilized life"); Murphy v. Walker, 51 F.3d 714, 718 n.8 (7th Cir. 1995). Cf. Ort v. White, 813 F.2d 318, 328 (11th Cir. 1987) (no constitutional violation to confine a prisoner in the salleyport to enforce a "no television" disciplinary sanction).

---

[16] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981); Stein v. Reynolds, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

Since Plaintiff has not shown a violation of the Eighth Amendment for his lack of access to television, sovereign immunity was not abrogated as to Plaintiff's specific ADA claim.  Defendant's motion for summary judgment should be granted on this claim as Plaintiff's request for nominal damages pursuant to Title II of the ADA is barred.

### Exhaustion of administrative remedies

Defendant argues that "Plaintiff did not exhaust his administrative remedies so as to support the metamorphosis his case has undergone."  Doc. 267, p. 16.  Defendant contends that when this case was filed, Plaintiff had been seeking access to a high decibel radio and he was not seeking access to a television with a radio transmitter.  *Id.*  Further, Defendant correctly points out that any grievances initiated after this case was filed do not fulfill the exhaustion requirement of 42 U.S.C. § 1997e(a).[17]  *Id.*, at 17.

This is unpersuasive.  Plaintiff was housed at an institution with television sets that transmitted audio by radio signals.  His only need then was to be allowed a radio that provide sound loud enough for him to hear.  He grieved that.  Defendant then transferred Plaintiff to an institution that doubled-down on the problem because the television sets did not transmit audio by radio signals.  Plaintiff's need, as grieved, remained exactly the same.

The purpose of the grievance requirement is to give prison officials an opportunity to internally address a complaint before a prisoner turns to the judicial

---

[17]"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  Alexander v. Hawk, 159 F.3d 1321, 1324-26 (11th Cir. 1998).

forum. *See* <u>Woodford v. Ngo</u>, 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006);

<u>Parzyck v. Prison Health Services, Inc.</u>, 627 F.3d 1215 (11th Cir. 2010).

> Nothing in the FDOC's grievance procedures requires inmates to file new grievances addressing every subsequent act by a prison official that contributes to the continuation of a problem already raised in an earlier grievance. The only FDOC requirements regarding the contents of grievances are that they must accurately state the facts and "address only one issue or complaint."

<u>Parzyck</u>, 627 F.3d at 1219, *quoting* Fla. Admin. Code Ann. §§ 33-103.006(2)(e), (2)(f).

Judge Hinkle's order in <u>Johnson v. Florida Department of Corrections</u>, case

number 4:10cv570-RH, is:

> The Department's argument is also at least partially premised on a mischaracterization of the c of relief is limited to the specific technical accommodation requested. Thus, when a new facility has different technology that requires a different solution, the new problem has not been adequately grieved. But that is incorrect. Mr. Johnson is a disabled person alleging placement in a facility that provides unequal access to services without providing a reasonable accommodation. His requested relief would apply to the Department across all of its facilities—it could not evade any injunctive relief simply by transferring Mr. Johnson to yet another facility that could not implement the precise technical solution applied at the facility where Mr. Johnson won the case. *Cf.* 28 C.F.R. § 35.152(b)(2)(iii) (requiring public correctional authorities to not "place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed").

 Doc. 278, ex. 1, p. 9.

The purpose of the exhaustion requirement of the PLRA was met, and the

Defendant's summary judgment on exhaustion grounds should be denied.

### Discrimination under the ADA

The motion for summary judgment as to the ADA claim should be denied for the

reasons discussed above with respect to the Rehabilitation Act claim. Plaintiff has

presented a triable ADA claim and a jury should decide the disputed factual issue as to

whether Defendant denied Plaintiff a reasonable accommodation.

**Plaintiff's motion for summary judgment, doc. 268**

Plaintiff clarifies that his "prayer for relief is that he be provided with the same access to the television and radio as non-disabled inmates."  Doc. 268, p. 2.  Plaintiff states that his request is for "access," and the means by which the Department provides that access to these services is not at issue.  *Id.*, at 2-3.  "Any suggestions that [Plaintiff] has provided as to how the Department could satisfy its obligations under federal law are merely that – suggestions." *Id.*, at 3.  Plaintiff notes, however, that under ADA regulations, his "suggestions should be given primary consideration by the Department." *Id.*, *citing* 28 C.F.R. 35.160(b)(2).

### Violations of the ADA and Rehabilitation Act

Plaintiff argues that Defendant has violated, and continues to violate the ADA and the Rehabilitation Act.  Doc. 268, p. 5.  Plaintiff asserts he has established the three necessary elements to support these claims: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities; and (3) that the exclusion, denial of benefit, or discrimination was by reason of his disability."  Doc. 268, pp. 5-7.  As noted earlier in this report and recommendation, the only dispute between the parties concerns the third element.  Plaintiff has shown that because he is deaf, he has been excluded from participation in the Defendant's "services and programs – namely, the ability to hear the television and radio."  *Id.*, at 5-6.  Plaintiff contends he has made reasonable suggestions for access, which Defendant could provide at minimal cost and without fundamentally altering the nature of the program.  *Id.*, at 6-7.

Again maintaining that Plaintiff's claims are moot and unexhausted, doc. 276, pp. 2-5, Defendant[18] argues that Plaintiff fails to show discrimination.  *Id.*, at 5.  Defendant points out that Plaintiff was provided with a hearing aid, that closed captioning was provided on television, that radios were made available for purchase in the canteen, and that the decision to deny Plaintiff's request was based on relevant considerations.  *Id.*, at 5-6.  As I concluded above, these asserted accommodations were insufficient for Plaintiff and a jury could consider them unreasonable under the circumstances.  But the reasonableness of those accommodations is a jury issue.  Plaintiff's summary judgment motion should be denied on the ADA and Rehabilitation Claims.

**Necessity of an Injunction**

Plaintiff contends that he "requires an injunction that not only affords him access to a transmitter, but also mandates that the Department will not in the future strip [Plaintiff] of his radio, amplifier, and hook, nor deny him access to a transmitter, because the Department's alleged voluntary cessation of offensive conduct (i.e., the denial of a radio, amplifier, and hook) was not truly voluntary, and was done solely in an attempt to deprive this Court of jurisdiction."  Doc. 268, pp. 7-8.  Plaintiff contends an injunction is required because the Department "previously granted [Plaintiff] a reasonable accommodation similar to the one he is seeking here . . . and then in 1992 stripped [Plaintiff] of that very equipment, for which his family paid."  *Id.*, at 8.

Until liability is established, the propriety of an injunction is premature.  The parties should be directed to meet to determine the feasibility of settlement of this case.

---

[18] Defendant's response, doc. 276, is essentially a restatement of Defendant's own motion, doc. 267.

**Nominal damages**

Plaintiff seeks nominal damages for the violations of the ADA and Rehabilitation Act.  Doc. 268.  Plaintiff's request for nominal damages pursuant to Title II of the ADA is barred by Defendant's Eleventh Amendment immunity for the reasons discussed above. It is premature to grant nominal damages on the Rehabilitation Act claim since material issues still in dispute.

**Conclusion**

Accordingly, it is **RECOMMENDED** that:

1.  Defendant's summary judgment motion, doc. 267, be **GRANTED** as to liability for nominal damages for the ADA claim, but otherwise **DENIED**, that judgment not yet be directed.

2.  Plaintiff's summary judgment motion, doc. 268, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on December 20, 2010.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**